UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EASTMAN KODAK COMPANY,

                    Plaintiff,

          v.

KYOCERA CORPORATION,

                    Defendant.

_____

<u>DECISION & ORDER</u>

10-CV-6334CJS

## <u>PRELIMINARY STATEMENT</u>

Kodak has brought this suit against Kyocera seeking damages arising from Kyocera's alleged breach of a 2002 agreement between the parties granting Kyocera a license to use and sell Kodak's patented digital camera technology.  (Docket # 1).  According to Kodak, the patent licensing agreement (the "PLA") required Kyocera to pay royalties to Kodak on all of the components of its products with "digital camera functionality," but Kyocera instead paid royalties on only some of the components.  (*Id*. at ¶ 25).  Kodak also contends that the royalty payments were to be based on the sales price of the digital camera products, rather than, as Kyocera calculated the payments, the purchase price of the individual components.  (*Id*. at ¶ 27).  Finally, Kodak contends that Kyocera failed to pay royalties on all of the digital camera products it sold and refused to provide complete and accurate royalty payment records to Kodak's auditors.  (*Id*. at ¶¶ 29, 31).

          Currently pending before this Court are two motions.  First, Kyocera has moved to compel production of communications between Kodak's attorneys and the auditing firm of

Deloitte & Touche ("Deloitte"), which Kodak maintains are protected from disclosure under the attorney work product doctrine.  (Docket # 75).  Second, Kodak has moved to disqualify Kyocera's expert witness, Robert Wallace ("Wallace").  (Docket # 86).  For the reasons discussed below, Kyocera's motion to compel is granted, and Kodak's motion to disqualify is denied.  I turn first to Kyocera's motion to compel.


## I.  Kyocera's Motion to Compel

### A.  Factual Background

Kyocera seeks to compel production of certain withheld and redacted communications between Kodak's attorneys and Deloitte that Kodak has designated as attorney work product.[1]  (Docket # 75).  According to Kodak, all of the communications at issue occurred after Kodak anticipated litigation with Kyocera.  (Docket # 82 at 1).  Kodak asserts that the communications "reveal Kodak's attorneys' efforts to evaluate breach of contract claims against Kyocera" and are related to "discussions that Kodak's attorneys had with Deloitte to gather information relating to a potential lawsuit against Kyocera."  (Id. at 1, 4).

Under the PLA, Kodak was permitted to hire annually a "mutually agreed upon independent auditor . . . [to] provide Kyocera and Kodak with a report relating only to the accuracy of the information set forth in [Kyocera's] royalty statement."  (Docket # 114-2, Ex. 2 at § 5.3).  In 2005, with Kyocera's consent, Kodak hired Deloitte to conduct the contractually-permitted audit.  (Kodak has not provided the Court with a copy of any engagement

---

[1] After the motion was filed, Kodak produced numerous documents that it had previously designated as privileged.  (Docket # 82 at 1, 4).

letter with Deloitte).  Prior to the audit, Kodak sent a letter to Kyocera announcing its intent to exercise its audit rights under the PLA.  (Docket # 71-3, Ex. A).  Specifically, that April 1, 2005 letter advised Kyocera that "Kodak intends to exercise its right to have an independent auditor review and test the underlying support and methodologies used to calculate royalties due" in accordance with Paragraph 5.3 of the PLA.  (*Id.*).  Kodak explained that the audit was part of an inspection program that it had implemented in an effort "to develop and follow industry best practices."  (*Id.*).  In accordance with the terms of the PLA, Kodak sought Kyocera's approval of Deloitte to conduct the contractually-permitted audit.  (*Id.*).

Deloitte conducted the audit and issued an initial report in November 2005 and a revised report in February 2006.  (Docket # 71-3 at ¶¶ 4-5).  During the course of the audit, a dispute arose over the manner in which royalties were supposed to be calculated under the terms of the PLA.  (Docket ## 75-1 at 2; 82 at 3).  According to Kodak, when it learned from Kyocera in early December 2005 that it was calculating royalty payments based on only the camera module, Kodak notified Kyocera that it was in violation of the PLA.  (Docket # 82 at 3).  The parties' subsequent efforts to resolve the dispute were not successful.  (*Id.*).

On May 23, 2008, Kodak's outside counsel retained Deloitte for additional audit work.  (Docket # 85, Ex. 1).  On June 1, 2008, Deloitte wrote to Kyocera confirming its understanding that "Kodak and Kyocera have agreed to complete that portion of an inspection performed by Deloitte in 2005 relating to Kyocera's sale of camera phones and camera modules [and] to [conduct] a selective inspection of Kyocera's sales of camera phones and camera modules for the period April 1, 2005 through March 31, 2008."  (Docket # 89-1, Ex. R).  The letter acknowledged Deloitte's understanding that the parties disputed "the scope and meaning of

3

certain terms in the [PLA]." (*Id*. at n.1). Both Kodak's and Kyocera's outside counsel were copied on the letter. (*Id*.).

Eight weeks later, on July 31, 2008, Deloitte sent a letter to Kodak's counsel acknowledging that it had been retained by counsel "in connection with Kodak's ongoing negotiations with [Kyocera] regarding a patent license agreement (the "Kyocera Matter")." (Docket # 82-1, Ex. 1). Deloitte further acknowledged its understanding that "Counsel's intention and the position of Counsel [is] that our work for it will be covered by the attorney work-product privilege and other applicable privileges." (*Id*.). Deloitte agreed to treat all working papers, documents and communications as confidential information. (*Id*.). Finally, the agreement specified that Deloitte would "provide assistance in reading the financial information and other data relevant to this matter in order to assist Counsel and [Kodak] with the Kyocera Matter." (*Id*.). Kyocera was not copied on Deloitte's letter to Kodak.

Deloitte issued its final audit report on January 27, 2009. (Docket # 71-3, Ex. E).

Kodak filed this lawsuit in June 2010. (Docket # 1). During discovery, Kodak initially withheld as privileged hundreds of documents exchanged with Deloitte during the audit process. (Docket # 71-2 at 2-3). Since then, Kodak has produced over 500 communications with Deloitte that it had originally withheld, including 159 communications produced after the instant motion was filed. (Docket # 82 at 4). According to Kodak, it has now produced all documents concerning Kodak's retention of Deloitte, the instructions it provided to Deloitte and the scope of Deloitte's work, along with Deloitte's draft and final audit findings and conclusions from both the 2005 and 2008 audits. (*Id*. at 4, 7). Kodak contends that the only documents it is withholding are those "that resulted from Kodak's anticipation of litigation." (*Id*. at 7).

4

At this stage, Kodak continues to withhold 37 communications and has produced redacted versions of 40 others, all of which have been provided to this Court for *in camera* review. (Docket # 82-1 at ¶ 10). The communications at issue occurred after December 7, 2005, – the date on which Kodak represents that it reasonably anticipated litigation with Kyocera (as a result of Kyocera's notification that its royalty payments were calculated based upon the camera module only). (Docket # 82 at 3). According to Kodak, they consist of communications between Kodak's attorneys and Deloitte following the 2005 and 2008 audits (1) "relating to how Kyocera was paying royalties" and (2) "relating to the documents that Kyocera refused to provide to Deloitte." (*Id*. at 4).

### B. <u>Discussion</u>

The purpose of the attorney work product doctrine is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).

Rule 26(b)(3) provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3).  The Second Circuit has interpreted the rule to protect any documents that "were prepared 'because of' existing or expected litigation."  *United States v. Adlman*, 134 F.3d at 1198.

The party asserting the privilege bears the burden of establishing it.  *In re Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y. 1992).  *Ipse dixit* assertions or unsupported conclusions are insufficient to establish the privilege.  *E.E.O.C. v. Johnson & Higgins, Inc.*, 1998 WL 778369, *4 n.4 (S.D.N.Y. 1998) (attorney's conclusory statement that documents reflected the attorney's "thoughts, impressions and strategies" was insufficient to establish work product protection) (citing *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984)).

Kyocera argues that the withheld and redacted documents were not created because of litigation, but were created in the ordinary course of business.  (Docket # 89 at 4-7).  In the alternative, Kyocera contends that Kodak waived any protection under the attorney work product doctrine when its attorneys shared their thoughts and strategies with Deloitte because Deloitte was reasonably likely to disclose those communications to Kyocera.  (*Id*. at 7-10).

As an initial matter, the fact that some of the withheld and redacted documents were prepared by Deloitte, a third party, does not defeat work product protection.  *See Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 2011 WL 6102014, *5-6 (E.D.N.Y. 2011) (documents created by third-party consultants may qualify for attorney work product protection provided third party created the documents because of litigation) (collecting cases).  However, "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not entitled to attorney work product protection.  *Adlman*,

134 F.3d at 1202.  *See Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 2011 WL 6102014 at *6 (critical

question is whether third party's documents "would have been created because of anticipated

litigation or whether [they] would have been created in the ordinary course of business").  As the

Second Circuit has reasoned, "[e]ven if such documents might also help in preparation for

litigation, they do not qualify for protection because it [cannot] fairly be said that they were

created 'because of' actual or impending litigation."  *Adlman*, 134 F.3d at 1202.  For that reason,

"even where an engagement letter states that an auditor is retained in anticipation of litigation,

and even where the party retaining the auditor has a reasonable good faith belief that it might end

up in litigation, the audit will not be protected where the documents would have been created in

essentially similar form irrespective of litigation."  *GenOn Mid-Atlantic, LLC v. Stone &*

*Webster, Inc.*, 2011 WL 2207513, *3 (S.D.N.Y. 2011).

Kyocera relies on *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.* to urge

rejection of Kodak's invocation of the work product.  In *GenOn*, as in this case, the parties had

executed a contract that contained a provision authorizing one party (GenOn) to audit the books

and records of the other (Stone & Webster).  2011 WL 2207513 at *2.  GenOn notified Stone &

Webster of its intent to exercise its contractual audit rights and obtained its consent to GenOn's

choice of third-party auditor.  *Id.*  GenOn did not inform Stone & Webster that the auditor had

been retained by its counsel or that its counsel was involved in directing the audit.  *Id.*  Following

the audit, litigation ensued, and GenOn resisted production of the audit records on the grounds

that the records were protected attorney work product.  *Id.*  In rejecting the work product claim,

the court concluded that the audit documents would have been created in essentially similar form

irrespective of the litigation, noting:

> When [the auditor] approached Stone & Webster about the audit, it
> acted under authority of this contractually mandated audit
> procedure, and there was no representation that any portion of the
> audit went above and beyond what was contemplated by the
> [parties'] Agreement.  Neither has GenOn argued that the audit
> contains information beyond that which would have been recorded
> in the ordinary course under the contractual audit provisions.

*Id*. at *3.

The similarities between the factual record before the court in *GenOn* and the record in this case are obvious.  In this case, as in *GenOn*, the terms of the parties' agreement included an audit provision.  Specifically, Paragraph 5.3 of the PLA obligated Kyocera to submit to an audit, at Kodak's election and expense, by a "mutually agreed upon independent auditor."  When Kodak notified Kyocera in 2005 of its intent to exercise its audit rights, it, like GenOn, invoked its contractual audit rights and sought consent to the third-party auditor.[2]  No evidence has been presented that Kodak notified Kyocera in 2008 that the second audit was being performed for any different purpose.  Indeed, Deloitte's June 1, 2008 letter to Kyocera stated that its purpose was to "complete" its 2005 audit "relating to Kyocera's sale of camera phones and camera modules" and to conduct a "selective inspection" of such sales for the period April 1, 2005 through March 31, 2008.  (Docket # 89-1, Ex. R).  Even counsel's 2008 retention letter with Deloitte – which was not sent to Kyocera – never specifically mentioned the possibility of litigation, but only acknowledged that Deloitte's services were being requested "in connection

---

[2]  Because Kodak has not submitted a copy of its 2005 retention letter with Deloitte, the record does not demonstrate whether Kodak or its counsel retained Deloitte, whether Deloitte agreed to keep its communications with Kodak confidential or whether Deloitte understood that there was any purpose to the audit other than to comply with the stated purpose of Paragraph 5.3 to determine the "accuracy of the information set forth in the royalty statement."

with Kodak's ongoing negotiations with Kyocera Corporation regarding a patent licensing agreement dated August 21, 2002."  (Docket # 82-1, Ex. 1).

The factual record in this case gives rise to two questions, one factual and one legal, I need not reach: first, whether Kyocera's consent to Deloitte's engagement in 2008 was conditioned on its understanding that the purpose of the 2008 audit was identical to the purpose of the 2005 audit; and, second, if so, whether Kodak may be foreclosed from claiming work product protection under principles of estoppel or waiver.  Rather, based on my review of the withheld and redacted documents, I conclude that they cannot "fairly be said to have been prepared or obtained because of the prospect of litigation."  *Adlman*, 134 F.3d at 1202.

The challenged documents consist broadly of three categories of communications: first, drafts of and communications concerning Deloitte's letter to Kyocera announcing the 2008 audit (*e.g.*, documents identified with Bates Nos. 3813240, 3813257-62, 3852607, 3852622, 18305-308); second, communications concerning the development of the 2008 audit work plan (*e.g.*, Bates Nos. 3849917, 3852600, 3852602-06, 3852628, 4802794-97, 4802973, 4802984, 4803367); and, third, communications about whether and, to what extent, Kyocera withheld documents from Deloitte during the course of that audit (*e.g.*, Bates Nos. 3805327, 3813364, 3852695, 4800549, 18221-24, 18359, 18363, 18372, 18385-90, 18465-70, 2565, 2871, 7655, 9174, 9189).[3]  As to the first category, the fact that Kodak sent a similar letter to Kyocera in 2005 announcing its intent to exercise its audit rights shows that written audit notice describing the scope of the audit was part of the parties' ordinary course of business and not prepared because

---

[3]  Contrary to Kodak's representation that all drafts of the audit reports have been produced, two are contained among the withheld documents.  (*See* Bates Nos. 4701610-18, 4701625-34).

of litigation.  Moreover, no showing has been made by Kodak that the drafts and revisions of the 2008 notice reflect input from counsel "beyond that which would have been [included] in the ordinary course."  *GenOn Mid-Atlantic, LLC*, 2011 WL 2207513 at *3.  As to the second category, development of the audit work plan was plainly part of the ordinary course of an audit.  Finally, as to the third category, the PLA obligated Kyocera to submit to an audit for the purpose of determining the accuracy of its royalty payment statements.  Any suggestion that Kodak would not have questioned Deloitte about Kyocera's cooperation in the audit and disclosure of documents had it not anticipated litigation strains credulity.  That inquiry is part of assessing the reliability of the audit, as evidenced by the fact that Deloitte's 2009 audit report disclosed that Kyocera had failed to provide certain documents.  That Kodak later based a legal claim on that information cannot shield from disclosure communications that occurred during the course of the audit about that subject.  (Docket # 71-3, Ex. E).  Finally, my review of the withheld documents identifies no documents that analyze potential legal claims against Kyocera or discuss potential litigation.  In short, I find that the withheld and redacted records would have been "created in essentially the same form irrespective" of the prospect of litigation.  *GenOn Mid-Atlantic, LLC*, 2011 WL 2207513 at *3.

            For the reasons set forth above, Kyocera's motion to compel is granted.  Kodak shall produce the withheld documents within one week of the date of this decision.  I turn next to Kodak's motion to disqualify Robert Wallace as Kyocera's expert witness.

## II.  **Kodak's Motion to Disqualify Kyocera's Expert**

### A.  **Factual Background**

Kodak moves to disqualify Robert Wallace ("Wallace") as an expert witness for Kyocera on the issue of damages.  (Docket # 86).  Prior to his retention by Kyocera in this case, Kodak retained Wallace in 2007 as a damages expert in a patent infringement case brought against it by the U.S. Philips Corporation ("Philips").  (Docket # 86-2 at ¶¶ 2-3).  Between July 2007 and January 2008, Wallace billed Kodak in excess of 800 hours for his services in the *Philips* litigation.  (*Id*. at ¶ 5).  Kyocera asserts that it hired Wallace, not because of his past work with Kodak, but because he has also worked for Kyocera as an expert in several prior lawsuits and has "impeccable credentials and extensive experience," and Kyocera "is comfortable with providing Mr. Wallace access to its sensitive financial information."  (Docket # 91-1 at ¶¶ 2-4).

In the *Philips* litigation, Philips claimed that Kodak had infringed one of its image compression patents.  (Docket # 86-1 at 2).  Kodak retained Wallace to offer expert testimony on damages – specifically, the amount that Kodak would have paid Philips as a reasonable royalty to license the patent technology at issue.  (*Id*. at 4).  The parties' retention agreement required Wallace to maintain the confidentiality of the information Kodak provided to him.  (Docket ## 86-2 at ¶ 4; 91 at 14).  Kodak alleges that it provided Wallace confidential information during the *Philips* litigation concerning Kodak's patent license agreements, digital camera technology, licensing program, business strategy and financial information.  (Docket # 86-2 at ¶ 8).  Although

Wallace was retained as a testifying expert and prepared an expert report,[4] he did not testify at

any trial because the parties negotiated a pretrial resolution of the lawsuit.  (*Id*. at ¶¶ 6-7).

        In preparing his expert report in the *Philips* litigation, Wallace reviewed various

agreements in which Kodak licensed its technology to third parties, including the PLA at issue

here and a license agreement with Casio.[5]  Both the PLA and Casio agreement were

cross-licenses granting both parties to the agreement licenses to certain patented technology from

the other.  (*Id*. at ¶ 9; Ex. 3 at 38).  Wallace determined that under both agreements Kodak

received "royalty payments as the '*net*' licensor as opposed to being the paying licensee."

(Docket # 86-2, Ex. 3 at 38).  On that basis, he concluded that the agreements "provide[d] no

relevant information" to the *Philips* litigation.  (*Id*.).

        As previously stated, a central issue in this case is the method by which Kyocera's

royalty payments are calculated under the terms of the parties' PLA.  Kodak contends that

Kyocera has breached the PLA by calculating its royalty payments based on only one component

of the camera phone, the camera module, rather than on all components involved in "digital

camera functionality."  (Docket # 86-1 at 8).  Kyocera maintains, by contrast, that the PLA's

definition of "Net Sales" limits its royalty payments to the camera module.  (*Id*.).

        Kodak argues that the notes that Wallace made of his review of the PLA in the

*Philips* case demonstrate that he "analyzed" the central issue at the heart of this case – "the

manner in which Kyocera . . . [was] required to pay royalties to Kodak under the terms of [its]

---

[4] The report and Wallace's deposition testimony were designated as "attorneys' eyes only" material under the parties' confidentiality agreement.

[5] According to Kyocera, because the Casio agreement contains some of the same terms that are at issue in the PLA, it is relevant to this litigation.  (Docket # 86-1 at 8-9).

license agreement with Kodak." (Docket # 86-2 at ¶ 9, Ex. 6). The notes consist of an equation in which the term "net sales" is multiplied by two figures, which reflects the formula for calculating Kyocera's royalty payments under the agreement. (Docket # 86-1 at 1). Wallace testified in a deposition that he made the notes "to summarize when I was looking at the agreement[]." (Docket # 86-2, Ex. 4 at 240-41). In addition to Wallace's notes on the PLA, Kodak has provided Wallace's notes on the Casio agreement, which are similar in substance to his notes on the PLA. (*Id.*, Ex. 5).

   Kodak contends that disqualification is also appropriate because Wallace discussed with Kodak employees Kodak's "digital camera patent portfolio," "digital camera technology, and the components that are involved in digital camera functionality" during the course of his work in the *Philips* litigation. (*Id.* at ¶ 10). Wallace's report in the *Philips* case states that he learned from speaking to a Kodak employee that Kodak's digital cameras employed between twenty-five and fifty patents and included as many as fifty distinct features. (*Id.*, Ex. 3 at 51).

   Kodak has submitted a supporting affidavit from one of its attorneys, Sean Cunningham, Esq., describing generally the services that Wallace was retained to provide in the *Philips* matter – expert testimony on the issue of damages – and the confidential information that Kodak provided Wallace during the litigation – "information regarding Kodak's patent license agreements, . . . digital camera technology, . . . licensing program and business strategy, and . . . financial information." (*Id.* at ¶ 3, 8). Cunningham's affidavit states that during the *Philips* matter, Wallace also "had discussions with Kodak employees, including Ken Parulski and Steve Sasson, regarding Kodak's digital camera patent portfolio, Kodak's digital camera technology,

and the components that are involved in digital camera functionality." (*Id*. at ¶ 10).  No

affidavits have been submitted from Parulski, Sasson or any other Kodak employees describing

their discussions with Wallace; nor has any affidavit from Wallace been submitted by either

party.

       B.  <u>Discussion</u>

       A court may disqualify a party's designated expert pursuant to "its inherent power

to preserve the integrity of the adversary process."  *1210 Colvin Ave., Inc. v. Tops Mkts., LLC*,

2006 WL 3827429, *4 (W.D.N.Y. 2006) (citing *Hempstead Video, Inc. v. Vill. of Valley Stream*,

409 F.3d 127, 132 (2d Cir. 2005)); *see also Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 2003 WL

23101783, *1 (W.D.N.Y. 2003) (citing *Popular, Inc. v. Popular Staffing Svcs. Corp.*, 239

F. Supp. 2d 150, 152 (D.P.R. 2003)).  For example, disqualification may be appropriate where a

party seeks to retain as an expert an adversary's former employee who learned confidential

information during the course of his employment, *see, e.g., Pellerin v. Honeywell Int'l Inc.*, 2012

WL 112539, *2 (S.D. Cal. 2012); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 2003 WL 23101783

at *1; *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 428 (E.D.

Pa. 2001); *Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369, *2 (N.D. Cal.

1995), or where an expert switches sides during the course of litigation, *see, e.g., Koch Refining*

*Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996); *Cordy v.*

*Sherwin-Williams Co.*, 156 F.R.D. 575, 582 (D.N.J. 1994).  Disqualification is a drastic remedy,

however, and should be resorted to rarely.  *See, e.g., Bone Care Int'l, LLC v. Pentech Pharm.,*

*Inc.*, 2009 WL 249386, *1 (N.D. Ill. 2009); *Hewlett Packard Co. v. EMC Corp.*, 330 F. Supp. 2d

1087, 1092 (N.D. Cal. 2004); *Chamberlain Grp., Inc. v. Interlogix, Inc.*, 2002 WL 653893, *2
(N.D. Ill. 2002).

        In determining whether disqualification is appropriate based on a prior
relationship between an expert and the party moving for disqualification, the court should
consider whether (1) the movant had a prior confidential relationship with the expert; and (2) the
movant had disclosed to the expert confidential or privileged information.  *1210 Colvin Ave., Inc.*
*v. Tops Mkts., LLC*, 2006 WL 3827429 at *5; *Eastman Kodak Co.*, 2003 WL 23101783 at *1;
*Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. at 428; *Hewlett*
*Packard Co. v. EMC Corp.*, 330 F. Supp. 2d at 1093 ("if only one of the two factors is present,
disqualification likely is inappropriate").  Some courts have emphasized that disqualification is
appropriate only where the confidential information that was disclosed to the expert is
"substantially related" to the subject matter of the expert's opinion in the instant case.  *See*, *e.g.*,
*Chamberlin Grp., Inc. v. Interlogix, Inc.*, 2002 WL 653893 at *3; *Greene, Tweed*, 202 F.R.D. at
430; *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, 2009 WL 249386 at *2.  Disqualification is
designed to protect the integrity of the judicial process by ensuring that experts do not use, even
unwittingly, confidential information that they learned from a party in the course of an earlier
engagement against that party in a later lawsuit.  *Pellerin v. Honeywell Int'l Inc.*, 2012 WL
112539 at *3 (rejecting "suggestion that [expert] can parse his knowledge of [party's]
confidential information to only rely upon what is provided to him in the litigation"; noting "the
human brain does not compartmentalize information in that manner").

        The party seeking disqualification bears the burden of establishing "that a
confidential relationship exists and that the confidentiality has not been waived."  *Eastman*

15

*Kodak Co.*, 2003 WL 23101783 at *1. *See also Hewlett Packard*, 330 F. Supp. 2d at 1093; *Bone Care Int'l*, 2009 WL 249386 at *1. "[T]he party seeking disqualification may not meet its burden with 'mere conclusory or *ipse dixit* assertions,'" *Greene, Tweed*, 202 F.R.D. at 429, but must identify "specific and unambiguous disclosures that if revealed would prejudice the party," *Hewlett Packard*, 330 F. Supp. 2d at 1094.

The record before the Court on the pending motion adequately establishes that a confidential relationship existed between Kodak and Wallace during the *Philips* litigation, and Kyocera does not contend otherwise. (*See* Docket # 91 at 14). Counsel for Kodak has submitted an affidavit affirming that "Wallace agreed to maintain the confidentiality of the Kodak information that he was provided" in the course of his expert engagement in the *Philips* matter. (Docket # 86-2 at ¶ 4). This sworn assertion is sufficient.

The parties' dispute concerns the second factor – whether Kodak shared confidential information with Wallace that is relevant to this lawsuit. Kodak maintains that "[d]uring his retention in the *Philips* litigation, Mr. Wallace was provided confidential information regarding Kodak's patent license agreements, confidential information regarding Kodak's digital camera technology, confidential information regarding Kodak's licensing program and business strategy, and confidential Kodak financial information." (Docket ## 86-2 at ¶ 8; 86-1 at 5-9). Taking the latter two subjects first – Kodak's business strategy and finances – the record simply contains no evidence as to either (1) the nature of the specific information provided to Wallace on those topics or (2) the relevance of any such information to this litigation.

Turning next to Kodak's contention that during the *Philips* litigation Wallace was provided confidential information concerning Kodak's patent licenses, Kodak emphasizes that

16

Wallace's report reveals that he considered the specific license and the royalty payment terms that are at issue in this case.  (Docket # 86-1 at 15).  According to Kodak, Wallace "*analyzed* the manner in which the PLA requires Kyocera to pay royalties to Kodak – the principal issue in dispute in this case[.]"  (*Id*. (emphasis added)).  Kodak further maintains that Wallace's notes demonstrate that he analyzed the very term in the PLA – "Net Sales" – that Kyocera relies on to support its royalty calculation in this case.  (*Id*.).  In Kodak's estimation, Wallace will be incapable of "eras[ing] from his mind the determinations he made regarding the language or terms of the PLA while working for Kodak."  (*Id*.).

Kodak does not appear to argue that disqualification is warranted simply because Wallace was provided or even reviewed the PLA during his *Philips* work.  Indeed, if that were sufficient, any party could impede a competitor's future ability to retain an industry expert by providing the expert with any document likely to be relevant to a future dispute no matter how irrelevant it might be to the subject matter of the expert's current engagement.  Rather, Kodak argues that Wallace did more than cursorily review the PLA; according to Kodak he *analyzed* its key terms.

Kodak's contention that Wallace in fact analyzed "the manner in which the PLA requires Kyocera to pay royalties to Kodak" is unsupported by any affidavit from Wallace describing his work.  Moreover, no evidence exists to demonstrate or even suggest that Wallace ever discussed the PLA or any of its terms with any Kodak employees, or otherwise obtained information about Kodak's interpretation of those terms.  At most, his notes reveal that he read the agreement and took notes to summarize some of its provisions.  Under these circumstances – where the record establishes only that an expert was previously provided with a document at

17

issue in a current litigation, reviewed it to learn its terms, discounted it as irrelevant to the

pending engagement and evidently never discussed it with any company representatives –

disqualification is not warranted.[6]  Kodak will not be prejudiced, *see Hewlett Packard*, 330

F. Supp. 2d at 1094, nor will Kyocera obtain an unfair advantage, *see Eastman Kodak Co.*, 2003

WL 23101783 at *5 ("material questions" include "whether use of . . . confidential knowledge

would give him an *unfair advantage* in acting as patent expert for [opposing party]"), by virtue of

the simple fact that Wallace previously reviewed the PLA during his engagement in the *Philips*

litigation.

      I turn finally to Kodak's contention that the "same digital camera functionality

that Mr. Wallace previously analyzed for Kodak is at issue here" because "[t]o establish the

amount of royalties that Kyocera has underpaid, Kodak will offer proof of the components of

Kyocera's camera phones other than the camera module that are involved in digital camera

functionality."  (Docket # 86-1 at 11).  I agree with Kodak that disqualification might well be

justified if the record established that during the *Philips* engagement Wallace had analyzed the

meaning of the term "digital camera functionality" and had learned confidential information from

Kodak about the manner in which various digital camera components contribute to camera

"functionality."  The deficiency in Kodak's argument, however, is that the record does not show

either.

      Cunningham's affidavit alleges in conclusory terms only that Kodak employees

shared with Wallace information about Kodak's digital camera technology and "the components

---

[6]  The record is equally insufficient to justify disqualifying Wallace on the grounds that Wallace conducted a similar review of the Casio licensing agreement and reached the same conclusion as to its irrelevance to the *Philips* litigation.

that are involved in digital camera functionality."  (Docket # 86-2 at ¶ 10).  The affidavit does

not describe the information that Wallace learned or assert that information about the

components was confidential.  Neither of the two employees identified as participants in those

conversations with Wallace have submitted affidavits.

Indeed, even in its supporting memoranda, Kodak does not describe the nature of

the information Wallace learned or what, if any of it, was confidential.  Rather, in its reply brief,

Kodak argues that disqualification is warranted because "there is no dispute that while working

for Kodak, Mr. Wallace spoke to Kodak's engineers about Kodak's digital camera technology"

and because "[t]here is no dispute that while working for Kodak on the *Philips* case, Mr. Wallace

was required to keep the information he received confidential."  (Docket # 98 at 1).  Even

assuming the accuracy of both assertions, disqualification is not justified.  The existence of a

confidentiality provision does not transform non-confidential information into confidential

information.

Under the applicable standards discussed above, Kodak bears the burden of

demonstrating that disqualification is appropriate.  It has not met that burden.  Although

Wallace's expert report in *Philips* states that he had conversations with two Kodak employees

about digital camera "features" that make cameras "both technically functional and desirable to

consumers," the report does not state that he identified the features that contributed to

functionality rather than to consumer desirability, or that he discussed with the Kodak employees

which components contributed to "camera functionality" and, if so, how.  (Docket # 86-2, Ex. 3

at 51-52).  Moreover, as Kyocera has noted, many of the "features" identified in Wallace's report

are features that Kodak had identified and touted in its own marketing materials.  (*See* Docket

# 91-1 at ¶ 10 and Ex. C).  Thus, the record fails to demonstrate that Kodak disclosed non-public, confidential information to Wallace about the components in Kodak's digital cameras that contribute to "digital camera functionality."  *Greene, Tweed*, 202 F.R.D. at 430 ("the fact that an individual may have had access to *public* information about a product cannot be a basis to disqualify him from being an expert") (emphasis in original).

In sum, Kodak has failed to point to "specific and unambiguous disclosures [made to Wallace] that if revealed would prejudice" Kodak in the instant action.  *Hewlett Packard*, 330 F. Supp. 2d at 1094.  Accordingly, I deny Kodak's motion to disqualify Wallace as an expert witness for Kyocera in this litigation.

## CONCLUSION

For the reasons discussed above, Kyocera's motion to compel **(Docket # 75)** is **GRANTED**.  Kodak shall produce the withheld documents within one week of the date of this decision.  Kodak's motion to disqualify **(Docket # 86)** is **DENIED**.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
    September   17   , 2012